Christopher L. Lebsock (CA No. 184546)
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
(415) 633-1908
  clebsock@hausfeld.com

James J. Pizzirusso* (D.C. Bar No. 477604)
Amanda V. Boltax* (D.C. Bar No. 90013893)
Ian E. Engdahl* (D.C. Bar No. 1613748)
**HAUSFELD LLP**
888 16th Street N.W., Suite 300
Washington, DC 20006
(202) 540-7200
  jpizzirusso@hausfeld.com
  mboltax@hausfeld.com
  iengdahl@hausfeld.com

Steven M. Nathan (CA No. 153250)
**HAUSFELD LLP**
33 Whitehall Street
Fourteenth Floor
New York, NY 10004
(646) 357-1100
  snathan@hausfeld.com

*Attorneys for Plaintiff*
*\* pro hac vice forthcoming*

Joseph J. DePalma* (N.J. No. 2151982)
Catherine B. Derenze* (N.J. No. 275852018)
Collin J. Schaffhauser* (N.J. No. 433052023)
**LITE DEPALMA GREENBERG**
**& AFANADOR, LLC**
570 Broad St., Suite 1201
Newark, NJ 07102
(973) 623-3000
  jdepalma@litedepalma.com
  cderenze@litedepalma.com
  cschaffhauser@litedepalma.com

Mindee J. Reuben* (N.J. No. 75308)
**LITE DEPALMA GREENBERG**
**& AFANADOR, LLC**
1515 Market Street, Suite 1200
Philadelphia, PA 19102
(215) 854-4060
  mreuben@litedepalma.com

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| CAMERON KING, *individually and on behalf of all others similarly situated*, | Case No. |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | JURY TRIAL DEMAND |
| PAYPAL HOLDINGS, INC. and PAYPAL, INC., | |
| Defendants. | |

Plaintiff Cameron King brings this Class Action Complaint, individually and on behalf of all others similarly situated (the "Class Members") against Defendants PayPal Holdings, Inc. and PayPal, Inc. ("Defendants" or "PayPal"), and allege as follows, based upon information and belief, investigation of counsel, and the personal knowledge of Plaintiff.

## NATURE OF CASE

1. Founded in 2012, Honey took the internet by storm with a clear value proposition to users all across the web: Save money when online shopping at no cost and with no additional effort.

2. To earn these savings, online shoppers simply had to install the Honey browser extension, and Honey would do the rest of the work, automatically applying coupon codes, if available, when shoppers checked out online. If Honey failed to locate any applicable coupons, online consumers could rest assured that they were getting the best deal available.

3. Given the extraordinary growth of Honey, Defendant PayPal Holdings, Inc. acquired Honey in 2020 for approximately $4 billion.[1] PayPal renamed the extension "PayPal Honey."

4. In paid promotions for PayPal Honey, thousands of social media's most well-known online content creators were enlisted to promote PayPal Honey as "literally free money," saving users on online purchases without the cumbersome effort of manually searching for discount or promotional codes, claiming "it doesn't make sense to not be using this" and calling on their collective hundreds of millions of followers to "Join Honey."

5. These calls to action were effective, with PayPal Honey's user base exploding from 900,000 in 2018 to over 20 million users in late 2024.

6. Behind the scenes, however, PayPal Honey has built its billion-dollar coupon-code empire on practices far more pernicious than paid sponsorships with famous YouTubers. Far from the ally of content creators that PayPal Honey made themselves out to be, PayPal Honey has been diverting millions of dollars from online content creators, including the very same influencers it paid to promote its product.

---

[1] *See* Press Release, *PayPal Completes Acquisition of Honey*, PayPal Newsroom (Jan. 6, 2020), https://newsroom.paypal-corp.com/2020-01-06-PayPal-Completes-Acquisition-of-Honey.

**CLASS ACTION COMPLAINT**

7.      To effectuate this scheme, PayPal Honey has employed a tactic known as "cookie stuffing," a form online marketing fraud where a malicious affiliate marketer—here, PayPal Honey—secretly places tracking cookies on a user's browser, making it appear as if the user came to a website through *its* affiliate link, even if the user did not, allowing PayPal to fraudulently earn commission on sales that it did not actually generate by driving traffic to the site. This deceptive tactic has allowed PayPal to profit off of the promotional efforts of online content creators like Plaintiff and Class Members, by maliciously replacing the legitimate affiliate cookies of Plaintiff and Class Members with PayPal's own affiliate cookies just as users begin the checkout process.

8.      Plaintiff and Class Members are online content creators who earn revenue by promoting products or services. Plaintiff and Class Members create "content," such as videos, infographics, posts, tweets, and "stories," promoting particular products or services of online merchants, and then share that content on their social media accounts to be viewed by Internet users. These content creators will typically include an "affiliate link" to the product or service that they are promoting. The affiliate link will redirect a viewer of a content creator's online post to the website of the online merchant that is selling the product or service that is being promoted.

9.      When a user clicks an affiliate link to purchase a product or service, the content creator who promoted the product earns a commission for referring the consumer to that store. This process is known as "affiliate marketing," and amounts to an industry valued at roughly $10 billion dollars in the United States alone.

10.      Affiliate marketing works as follows: First, a content creator recommends a product or service in an online post, accompanied by an affiliate link to purchase the recommended product or service. Next, a user who views that online content and decides she wants to purchase the recommended product, clicks on the affiliate link to visit the store's webpage and purchase the product. After the user clicks on a content creator's affiliate link, underneath the hood, an "affiliate tracking cookie" or "tracking tag" is embedded in the URL on the store's webpage and stored in the user's browser. Finally, the user completes her purchase, and the affiliate tracking cookie lets the store know who should get the commission for driving the sale.

**CLASS ACTION COMPLAINT**

11.　　Enter PayPal Honey. If a user has PayPal Honey installed in their browser and chooses to use PayPal Honey to search for discounts, under PayPal's scheme, PayPal replaces the tracking cookie associated with the content creator's affiliate link with a new tracking cookie that erases all traces of the original content creator. As a result of PayPal's scheme, PayPal is credited as the source of the sale, and thus receives any commission that is generated. PayPal Honey accomplishes this by discreetly opening a small new tab when a user chooses to "apply discounts" using PayPal Honey, which acts like a simulated referral click, as though PayPal was the one to refer the purchaser to the website, even though the user was already on the website and at the checkout page. Once PayPal Honey has finished "stuffing" its cookie, the tab automatically closes.

12.　　In other words, when a consumer clicks on a content creator's affiliate link but later uses PayPal Honey, the content creator's affiliate cookie is overwritten by PayPal Honey's own cookie. As a result, PayPal claims 100% of the commission for the sale originally driven by the content creator.

13.　　PayPal Honey usurps this commission even when it fails to find a coupon code. PayPal Honey will still replace the content creator's affiliate tracking cookie with PayPal's, even though PayPal Honey did nothing to refer the sale.

14.　　Most affiliate marketing revenue is earned through a process called "last click attribution" which means that the final link a user apparently clicks before purchasing the product— here, because of its unlawful scheme, PayPal—will receive 100% of the commission generated by the affiliate link.

15.　　By implementing this malicious cookie-stuffing scheme, PayPal is able to poach the commissions of Plaintiff and other online content creators.

16.　　In effect, the content creator who promoted the online merchant's product or service in the first instance, referred their viewers directly to that online merchant's website, and ultimately had their viewers purchase that online merchant's product or service is deprived of their commission; while PayPal, a more than $85 billion-dollar company, walks away with the entire commission.

**CLASS ACTION COMPLAINT**

17.     As a result of Defendants' scheme, Plaintiff and Class Members have incurred, and will continue to incur, damages from the theft of their commission payments.

18.     Accordingly, Plaintiff brings this action against Defendants, seeking redress for Defendants' unlawful conduct and asserting claims for: (1) unjust enrichment; (2) interference with a prospective economic advantage; (3) conversion; (4) the Computer Fraud and Abuse Act; (5) the California Comprehensive Computer Data Access & Fraud Act; and (6) the California Unfair Competition Law.

19.     Through these claims, Plaintiff seeks damages in an amount to be proven at trial, as well as injunctive and other equitable relief, including the enjoinment of PayPal from continuing to divert the commission payments of Plaintiff and Class Members.

## THE PARTIES

20.     Plaintiff Cameron King is a natural person, resident, and citizen of the State of California.

21.     Defendant PayPal Holdings, Inc. is a Delaware Corporation with its principal place of business at 2211 North First Street, San Jose, California 95131.

22.     Defendant PayPal, Inc. is the wholly owned subsidiary of Defendant PayPal Holdings, Inc., is a Delaware Corporation, and its principal place of business is 2211 North First Street, San Jose, California 95131.

## JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

23.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1367.

24.     This Court also has original jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because at least one member of the putative Class, as defined below, is a citizen of a different state than Defendants, there are more than 100 putative class members, and the amount in controversy exceeds $5 million exclusive of interest and costs.

25.     This Court has general personal jurisdiction over Defendants because all Defendants operate in and direct commerce in this District. Plaintiff is a California resident whose rights were violated by Defendant in California.

26. Venue is proper in this Court because a substantial part of the events giving rise to this action occurred in this District and Defendants have harmed Class Members residing in this District.

27. Because a substantial part of the events and omissions that give rise to Plaintiff's claims took place in the County of Santa Clara, this action should be assigned to the San Jose Division under Local Rule 3-2.

**PayPal Honey**

28. Honey Science Corporation was a Los Angeles-based tech company founded in 2012, and the creator of the Honey web browser extension.[2]

29. On January 6, 2020, PayPal Holdings, Inc. acquired Honey Science Corporation, along with its web browser extension, for approximately $4 billion in cash.[3] PayPal renamed the Honey web browser extension "PayPal Honey" in June 2022.[4]

30. PayPal Honey is a free web browser extension that can be used with the Google Chrome, Firefox, Safari, Opera, and Microsoft Edge web browsers.[5]

31. A browser extension is a downloadable piece of software that a user can add to their web browser to extend that browser's capabilities beyond its default features.[6] More specifically, a web browser extension is a small software program that operates within the confines of a web browser, extending that web browser's capabilities beyond that Internet browser's default features. Some common examples of browser extensions include ad-blockers or website password managers.

---

[2] https://newsroom.paypal-corp.com/2019-11-20-PayPal-to-Acquire-Honey#:~:text=Founded%20in%202012%2C%20Honey%20is,savings%20as%20they%20shop%20online.
[3] https://www.prnewswire.com/news-releases/paypal-completes-acquisition-of-honey-300981363.html
[4] https://help.joinhoney.com/article/374-what-is-paypal-honey
[5] https://help.joinhoney.com/article/39-what-is-the-honey-extension-and-how-do-i-get-it#thebasicssigningup
[6] https://brave.com/learn/what-are-web-browser-extensions/

32.     An Internet user can add the PayPal Honey web extension to their respective web browser for free either by visiting PayPal Honey's website at joinhoney.com/paypal or by searching for "Honey" in their web browser's browser extension store.[7]

33.     Once an Internet user adds the PayPal Honey browser extension their web browser, a "h" icon will appear on their web browser either in the top right corner or left of the search bar, depending on the web browser the Internet user is utilizing[8]:



34.     How PayPal Honey claims it works is that while an Internet user is shopping for a product or service on an online merchant's website, the PayPal Honey browser extension automatically searches for and tests available coupon codes at checkout for that product or service.[9] If PayPal Honey finds a valid coupon code, it will then apply that coupon code to that Internet user's shopping cart with the online merchant.[10]

35.     A PayPal Honey user will know whether the browser extension found any applicable coupons for the product or service that they are shopping for because the "h" icon on their web

---

[7] https://help.joinhoney.com/article/39-what-is-the-honey-extension-and-how-do-i-get-it#thebasicssigningup
[8] *Id.*
[9] *Id.*
[10] *Id.*

**CLASS ACTION COMPLAINT**

browser will indicate the number of coupons that PayPal Honey found and the below window will also pop up automatically on an Internet user's screen[11]:



36.     If PayPal Honey is unable to find a coupon for what they are shopping for, PayPal Honey will inform the Internet user in a pop-up that they "already have the best price," that PayPal "searched . . . but didn't find any deals," or a similar pop-up likes the ones below:



[11] *Id.*

8

**CLASS ACTION COMPLAINT**

37.     The PayPal Honey browser extension works on 30,000+ "popular" online merchant's websites, including Amazon, Macy's, Walmart, and Target.[12]

38.     PayPal calls these online merchants its "merchant partners."[13] To entice these online merchants to become PayPal Honey's "merchant partners," PayPal claims that the coupon codes and other incentives it provided to PayPal Honey users "[i]ncentivize passive shoppers" to make purchases and are "an efficient way to attract buyers from discovery to checkout."[14]

39.     PayPal makes hundreds of millions of dollars from PayPal Honey through commissions from its merchant partners.

40.     When a PayPal Honey user makes a purchase of a product or service on a merchant partner's website and PayPal Honey applied a coupon to that user's purchase, PayPal earns a commission from its merchant partner ranging from 3% to 5% of the purchase price.[15]

41.     In addition to searching for coupons, PayPal Honey also offers a free rewards program to its users called "Honey Gold."[16]

42.     Honey Gold is a points-based program that gives PayPal Honey users "Gold" for making certain purchases with participating merchant partners.[17] "Gold is reward on the subtotal of eligible items."[18] PayPal Honey users can redeem their "Gold" for gift cards from its merchant partners.[19]

43.     Even if PayPal Honey cannot find a coupon for a product or service offered by a merchant partner, a Honey Gold pop-up will still occur for Internet users making eligible purposes:

---

[12] https://help.joinhoney.com/article/39-what-is-the-honey-extension-and-how-do-i-get-it#thebasicshowitworks;  https://www.joinhoney.com/stores/all
[13] https://help.joinhoney.com/article/30-how-does-honey-make-money
[14] https://www.joinhoney.com/business
[15] https://get.joinhoney.com/business/faq/
[16] https://www.joinhoney.com/faq
[17] *Id.*
[18] *Id.*
[19] *Id.*

**CLASS ACTION COMPLAINT**

44.    As of December 16, 2024, PayPal Honey had over 20 million users in the United States.[20]

**Content Creators and Affiliate Marketing**

45.    Online merchants, like Amazon, Walmart, and Macy's, partner with affiliate marketers for the promotion of their products and services and provide commissions from the sale of those products and services to those affiliate marketers in exchange.

46.    An affiliate marketer is a third-party publisher who promotes a company's products or services in exchange for a commission.

47.    Plaintiff and Class Members are content creators and social media influencers who create content on websites such as YouTube, TikTok, Twitter, Facebook, and Instagram, and earn commissions for promoting products and services as affiliate marketers.

48.    Affiliate marketing generally works as follows[21]:

- **First**, an affiliate marketer, like a content creator, will partner with an online merchant to promote its products and services. As a part of the partnership, an online merchant will provide an "affiliate link" to the content creator. An affiliate

---

[20] https://www.newsweek.com/honey-coupon-browser-extension-mrbeast-youtube-influencer-2007484
[21] https://grin.co/blog/affiliate-marketing-for-beginners/

link is a unique URL associated only with that specific content creator. When that link is clicked on, it will redirect a viewer of the content to the webpage of the product or service that the online merchant is selling and the content creator is promoting.

- **Second**, a content creator creates "content," promoting an online merchant's product or service. Examples of "content" include videos on YouTube and TikTok, Instagram and Facebook "stories," live streams on Twitch, and text posts on X (formerly known as Twitter).  The content creator will include the affiliate link with their content.

- **Third**, a content creator will post or stream that content on their social media accounts and their viewers, *i.e.* "followers," will view that content and have access to the affiliate link.

- **Fourth**, a content creator's viewer uses the affiliate link to view the online merchant's webpage of the product or service that the content creator was promoting. The viewer then purchases the product or service.

- And **fifth**, because the content creator's viewer purchased the online merchant's product or service using the affiliate link, the online merchant provides the content creator with a commission from the sale of the product or service. The commission rate that a content creator will receive varies depending on the product or service being promoted[22]:

---

[22] https://www.refersion.com/blog/affiliates-negotiation/#:~:text=If%20they're%20underperforming%2C%20then,be%20time%20for%20a%20bonus.

**CLASS ACTION COMPLAINT**

| Product Category | Affiliate Commissions (% of Sale) |
|---|---|
| Arts & Crafts | 12% |
| Beauty | 15-20% |
| Business | 20-25% |
| Clothing | 10-15% |
| Computers & Tech | 15-20% |
| Education | 20% |
| Family | 20-25% |
| Financial | 30-40% |
| Fitness | 10-20% |
| Food & Drink | 10-20% |
| Hair | 10% |
| Health | 20-30%+ |
| Home | 10-20% |
| Jewelry | 15-30% |
| Paleo | 10% |
| Pets | 10-20% |
| General Products | 10-20% |
| Recreation | 10% |
| Services | 30% |
| SaaS | 20-30% |
| Adult | 10-15%+ |

49.    Around 80% of affiliate marketers earn $80,000 a year or less from affiliate marketing, while top affiliate marketers can take in over $1 million[23]:

| Income | Share of Affiliate Marketers |
|---|---|
| Up to $80,000 | 80% |
| $80,000 to $1 Million | 15% |
| Over $1 Million | 1% |

50.    In 2023, the size of the affiliate marketing industry was $15.7 billion and, according to a report by Astute Analytica, it is expected to grow to $36.9 billion by 2030.[24]

51.    The affiliate marketing industry is profitable because it is an effective way to market products and services to consumers.

---

[23] https://www.demandsage.com/affiliate-marketing-statistics/
[24] https://www.rewardful.com/articles/affiliate-marketing-statistics#:~:text=The%20affiliate%20marketing%20market%20size,reach%20%2415.7%20billion%20by%202024.

**CLASS ACTION COMPLAINT**

52.    According to the 2024 Modern Consumer Survey published by GRIN, the world's leading online creator management platform, 74% of consumers have purchased a product because a social media influencer has recommended it.[25]

53.    In a 2023 survey from Matter Communications, 69% of survey respondents were more likely to trust a social media influencer's recommendation of a product or service over information an online merchant had provided about its product or service.[26]

54.    Affiliate marketing currently results in 16% of all e-commerce sales in the United States.[27]

**PayPal Honey Hijacks Content Creators' Affiliate Links**

55.    An affiliate link is a custom URL assigned to an affiliate marketer, such as a content creator, by an online merchant. [28]  The URL includes the content creator's "affiliate ID", *i.e.* a specialized number or username, that allows the online merchant to attribute future sales to the correct affiliate.[29] The affiliate link allows the online merchant to credit the content creator with commissions for any sales of their product or service that result from the content creator's marketing. [30]

56.    While affiliate links vary in appearance, the URL for those links generally contain the following common elements[31]:



___

[25] https://www.businesswire.com/news/home/20240320786326/en/U.S.-Shoppers-Are-Under-the-Influence-74-of-Consumers-Have-Purchased-a-Product-Because-an-Influencer-Recommended-It
[26] https://www.shopify.com/blog/influencer-marketing-statistics
[27] https://www.forbes.com/sites/forbesagencycouncil/2017/04/21/how-affiliate-networks-have-taken-affiliate-marketing-mainstream/?sh=5cdbd827569d
[28] https://www.authorityhacker.com/what-are-affiliate-links/
[29] *Id.*
[30] *Id.*
[31] *Id.*

57.    Once the content creator shares the affiliate link with the content that they posted on their social media accounts promoting an online merchant's product or service, an Internet user viewing the content can click on the affiliate link.[32] By clicking on the affiliate link, that Internet user will be directed to the page of the online merchant's website that is selling the promoted product or service.[33]

58.    When the viewer clicks the affiliate link, a small text file is stored on that Internet user's web browser that includes information about the content creator who provided the Internet user with the affiliate link.[34] The small text file is called a "cookie."

59.    Once a cookie is stored on an Internet user's web browser, the cookie tracks the Internet user's activity on the online merchant's website to determine whether the Internet user ultimately purchased the product or service associated with the content creator's affiliate link.[35]

60.    Depending on the online merchant that created an affiliated link for the content creator, a cookie associated with an affiliate link can be stored on an Internet user's web browser between 24 hours to 90 days or longer.[36] That means if an Internet user clicks on an affiliate link to view the product or service that a content creator has promoted, closes out of the online merchant's webpage for that product or service for whatever reason, but then returns to the online merchant's website to ultimately purchase the product or service, the content creator will still be rewarded with the commission from the sale.[37]

61.    This cookie-tracking process can be disrupted though. For example, if an Internet user clicks on affiliate links from different content creators that direct the Internet user to a webpage that sells the same product or service, the online merchant will only provide a commission for the

---

[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.*

**CLASS ACTION COMPLAINT**

sale of the product or service to the content creator associated with the last-used affiliate link of the purchaser.[38] This is called "last-click attribution model."[39]

62.    Unbeknownst to Plaintiff and Class Members, PayPal has been exploiting the last-click attribution model with the PayPal Honey web browser extension for years, depriving Plaintiff and Class Members of their hard-earned commissions.

63.    If an Internet user with the PayPal Honey web browser extension clicks on a content creator's affiliate link for a product or service, they will be greeted with several different types of PayPal Honey pop-ups:

- **First**, a PayPal Honey pop-up informing the Internet user that it has found coupons applicable to their purchase of the product or service. The pop-up will permit Internet users to click the "Apply Coupons" button.

- **Second**, while PayPal Honey may not find any coupons applicable to the product or service, PayPal Honey will still provide the Internet user with a pop-up informing them that no coupon is found and supplying several clickable buttons that state either: "Got it!"; "Continue to Checkout"; or "Try ["x" number] coupons."

- **Third**, PayPal Honey Gold will inform the Internet user in a pop-up that there are no available coupons but the Internet user can still claim Honey Gold if they click a button that states: "Claim Rewards."

- And **fourth**, PayPal does not offer the Internet user a coupon or Honey Gold, but instead provides a pop-up inviting the Internet user to checkout their online shopping chart on the online merchant's website using PayPal.

---

[38] *Id.*
[39] *Id.*

**CLASS ACTION COMPLAINT**



64.    Once an Internet user clicks the buttons on any of these enticing pop-ups from the PayPal Honey browser extension, PayPal discreetly opens a small new tab on the Internet user's web browser. This small tab then replaces the cookie associated with the affiliate link for the content creator with a cookie affiliated with PayPal. This new cookie falsely indicates to the online merchant that it was actually PayPal Honey, and not the content creator, that referred the Internet user to the online merchant's website. With this bait-and-switch complete, PayPal Honey automatically closes the small tab with the Internet user none the wiser.

65.    An example of how this scheme works is depicted in the below screenshots.

66.    The first screenshot shows a webpage for a product that an Internet user opened with an affiliate link. Magnified in this screenshot is the cookie stored on this webpage that identifies the content creator associated with the affiliate link: "shortcircuit." In the top right hand corner of the screenshot, there is also an enticing PayPal Honey web browser extension pop-up that indicates to the Internet user that there are coupons available for this product and provides a button for that Internet user to click to apply those coupons:

**CLASS ACTION COMPLAINT**



67.   The second screenshot depicts what occurs when an Internet user clicks on the button provided by the PayPal Honey web browser extension to apply the coupons. PayPal Honey opens a small and discreet tab that replaces the content creator's cookie which would have allowed an online merchant to identify who referred the Internet user to the product's webpage and earned the commission for the ultimate sale of the product. The screenshot below shows that after the Internet user clicked the PayPal Honey pop-up that the "shortcircuit" cookie was replaced with a "PayPal" affiliate cookie:



68.   The result of PayPal's programming ploy is that PayPal is given the last-click attribution for the sale of the online merchant's product or service and, subsequently, the online

merchant pays PayPal the commission on the sale despite PayPal playing no role in referring an Internet user to the online merchant's website.

69.    In the meantime, the content creator who had put in the time and effort to create the promotional content for the online merchant's product or service, had a viewer of that content click on an affiliated link which led that viewer directly to the online merchant's web page, and whose affiliate link ultimately resulted in the sale of that product or service, is left with no commission.

70.    PayPal's unlawful tactics are not novel. The scheme is known as "cookie stuffing." Cookie stuffing is a fraudulent affiliate marketing technique in which "the Web cookies used to determine the likely source of user traffic are overwritten without the user's knowledge."[40]

71.    As one academic research paper described the scheme:

> instead of using the affiliate URL as a clickable link, a fraudulent affiliate may cause the browser to directly fetch her affiliate URL on a page controlled by her without any explicit clicks from the user, thereby tricking the affiliate program into returning a cookie that then identifies the fraudulent affiliate as the referrer for the user's transactions. As a result, not only does an affiliate program pay a non-advertising affiliate, but the fraudulent cookie overwrites any existing affiliate cookie that may have already been present, thereby potentially stealing the commission from a legitimate affiliate. Furthermore, cookie-stuffing fraud is typically completely opaque to an end user and goes against the advertising guidelines issued by the Federal Trade Commission for marketers, which require declaration of any financial relationship with advertisers.[41]

72.    Extensions that attempt to commit such improper cookie-stuffing, like PayPal Honey, are classified as "malicious code" by cybersecurity companies such as McAfee, because they attempt to alter cookies they are not authorized to alter.[42]

### Plaintiff's Experience

73.    Plaintiff Cameron King is a content creator and social media influencer who has a popular Instagram account under the feline alias Benjamin Butterscotch. Benjamin Butterscotch is the name of Plaintiff's cat, and Plaintiff uses the account to post adorable cat content and promote

---

[40] Neha Chachra, Stefan Savage & Geoffrey M. Voelker, *Affiliate Crookies: Characterizing Affiliate Marketing Abuse*, PROCEEDINGS OF THE 2015 INTERNET MEASUREMENT CONFERENCE (2015).

[41] *Id.*

[42] McAfee Labs, *Malicious Cookie Stuffing Chrome Extensions with 1.4 Million Users* (Aug. 29, 2022), https://www.mcafee.com/blogs/other-blogs/mcafee-labs/malicious-cookie-stuffing-chrome-extensions-with-1-4-million-users/.

**CLASS ACTION COMPLAINT**

cat rescue and adoption efforts to the account's nearly 20,000 followers. Some of Plaintiff's posts recounting his personal cat rescue efforts have gone viral and have garnered hundreds of thousands of "likes."

74.     Plaintiff also provides affiliate links to cat products that he recommends to followers who are adopting or caring for cats. Plaintiff earns commissions through these affiliate links as part of the Amazon Associates affiliate program.

75.     Plaintiff has had followers specifically mention to him that they purchased a product through Plaintiff's affiliate links, only for no such sale to be reflected in Plaintiff's Amazon Associates account.

76.     Until PayPal's unlawful scheme was exposed in December 2024, Plaintiff was not able to identify the cause of his missing affiliate commissions.

77.     On information and belief, these commissions were improperly diverted from Plaintiff as a result of PayPal's unlawful scheme.

78.     If PayPal had not utilized the PayPal Honey web browser extension to divert his commissions to PayPal, Plaintiff would have earned additional commission payments from his affiliate links.

**Plaintiff's and Class Members' Damages**

79.     Plaintiff and Class Members have all suffered damages as a direct and proximate result of PayPal's practice of poaching their commissions from online merchants through the PayPal Honey browser extension.

80.     PayPal has done nothing to compensate Plaintiff and Class Members for the loss of their commissions.

81.     Moreover, Plaintiff and Class Members have an interest in ensuring that PayPal does not continue its practice of poaching their commissions from online merchants through the PayPal Honey browser extension.

**CLASS ACTION ALLEGATIONS**

82.     Plaintiff brings this action against Defendants individually and on behalf of other persons similarly situated.

83.    Plaintiff proposes the following Class and Subclass definitions, subject to amendment as appropriate:

**National Class:** All persons or, if minors, their parents or guardians, who partnered with an online merchant to promote a product or service, were provided with an affiliate link by an online merchant for the promotion of a product or service, and were deprived of compensation from the online merchant for the sale of the product or service associated with the affiliate link because of Defendants' practice of using PayPal Honey to divert their commission-based compensation to Defendants (the "Class").

**California Subclass:** All persons or, if minors, their parents or guardians, residing in California, who partnered with an online merchant to promote a product or service, were provided with an affiliate link by an online merchant for the promotion of a product or service, and were deprived of compensation from the online merchant for the sale of the product or service associated with the affiliate link because of Defendants' practice of using PayPal Honey to divert their commission-based compensation to Defendants (the "California Subclass").

84.    Excluded from the Class and Subclass are Defendants' officers, directors, and employees; any entity in which Defendants have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants. Excluded also from the Class and Subclass are members of the judiciary to whom this case is assigned, their families and members of their staff.

85.    Plaintiff reserves the right to amend or modify the Class or Subclass definition or create additional subclasses as this case progresses.

86.    <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them is impracticable. There are at least thousands of members of the Class and Subclass.

87.    <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.  Whether Defendants programmed the PayPal Honey browser extension to replace the cookie associated with an affiliate link with a cookie that wrongfully indicates to the online merchant that PayPal originated the sale of a product or service rather than Class Members;

b.  Whether Defendants were wrongfully provided the commissions of Class Members by replacing the cookie associated with an affiliate link with a cookie that wrongfully indicates to the online merchant that PayPal originated the sale of a product or service rather than an affiliate marketer;

c.  Whether Defendants were unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiff and Class Members;

d.  Whether Defendants through their actions alleged herein violated the Computer Fraud and Abuse Act;

e.  Whether Defendants through their actions alleged herein violated the California Comprehensive Computer Data Access & Fraud Act;

f.  Whether Defendants through their actions alleged herein violated the California Unfair Competition Law; and

g.  Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

88.  <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's commissions from online merchants for Internet users' purchase of products or services were diverted to Defendants like every other Class Members'.

89.  <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel are competent and experienced at litigating class actions.

90.  <u>Predominance</u>. Defendants have engaged in a common course of conduct toward Plaintiff and Class Members, in that Defendants diverted their commissions in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above

predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

91.    <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, to conduct this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

92.    Defendants have acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a classwide basis.

## **FRAUDULENT CONCEALMENT AND TOLLING**

93.    Plaintiff and Class Members had neither actual nor constructive knowledge of the facts constituting their claim for relief. They did not discover, nor could have discovered through the exercise of reasonable diligence, Defendants' practice of converting the affiliate links of Plaintiff and Class Members to divert commissions intended for Plaintiff and Class Members for the sale of an online merchant's products or services to Defendants.

94.    Due to Defendants' fraudulent concealment of their wrongful conduct, the running of the statute of limitations has been tolled and suspended with respect to the claims and rights of action of Plaintiff and Class Members as a result of Defendants' practice.

**CLASS ACTION COMPLAINT**

**CLAIMS FOR RELIEF**

**COUNT I**

**Unjust Enrichment**

***(On behalf of Plaintiff and the Class)***

95.     Plaintiff re-alleges and incorporates by reference all factual allegations above as if fully set forth herein.

96.     Plaintiff's and Class Members' commissions from online merchants for the sale of products or services associated with their affiliate links have monetary value.

97.     Plaintiff and Class Members directly conferred a monetary benefit on Defendants by partnering with online merchants to promote a product or service, creating content to promote that product or service, including an affiliate link that would refer their viewers of that content to the webpage for the product or service so their viewers could purchase that product or service, and ultimately having a viewer purchase the online merchant's product or service which Defendants wrongfully claimed credit for by exploiting the lack-click attribution model using the PayPal Honey web browser extension.

98.     Defendants knew that Plaintiff and Class Members conferred a benefit which Defendants accepted. Defendants profited from these wrongfully obtained commissions.

99.     Defendants enriched themselves through the PayPal Honey web browser extension's replacement of cookies associated with affiliate links with a cookie indicating that PayPal referred a customer to an online merchant's webpage for a product or service

100.     Under the principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiff and Class Members, because that monetary benefit was obtained through the inequitable means previously alleged.

101.     Plaintiff and Class Members have no adequate remedy at law.

102.     As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) the actual loss of commissions from online merchants for the sale of products or services resulting from Defendants' practice of poaching Plaintiff and Class Members' affiliate links; and (ii) the future loss of

commissions from online merchants for the sale of products or services resulting from Defendants' practice of poaching Plaintiff and Class Members' affiliate links.

103. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will continue to suffer injury and/or harm.

104. Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them by diverting their affiliate link commissions.

## COUNT II

### Interference with a Prospective Economic Advantage

### (*On behalf of Plaintiff and the Class*)

105. Plaintiff re-alleges and incorporates by reference all factual allegations above as if fully set forth herein.

106. Plaintiff and Class Members partner with online merchants to promote products and services in exchange for commissions.

107. Plaintiff and Class Members create content, such as videos, infographics, posts, tweets, and "stories," promoting particular products or services of online merchants, and then share that content on their social media accounts to be viewed by Internet users.

108. In that content, a content creator includes an "affiliate link" that is provided by the online merchant. The affiliate link will redirect a viewer of the content creator's content to the website of the online merchant that is selling the product or service that the content creator is promoting.

109. The affiliate link is unique to the content creator and also contains data that is used to generate a tracking cookie that allows the online merchant to identify the affiliate marketer that should earn the commission for the sale of a product or service.

110. Thus, if an Internet user clicks on a content creator's affiliate link and subsequently purchases the product or service, the content creator receives a commission from the online merchant for that Internet user's purchase.

111.   Defendants interfere with the partnership between Plaintiff and Class Members and online merchants through PayPal Honey despite being aware that partnerships between online merchants and affiliate marketers exist.

112.   Defendants, using the PayPal Honey web browser extension, intentionally replaced the tracking cookies associated with Plaintiff's and Class Members' affiliate links with tracking cookies associated with PayPal Honey.

113.   The tracking cookies that Defendants intentionally replaced would have permitted the online merchant to identify Plaintiff and Class Members as the rightful recipients of commissions earned from the sale of the products or services associated with the affiliated links.

114.   As a result, Plaintiff and Class Members who promoted the online merchants' products or services, referred customers to these online merchants' webpages for these products and services, and had those customers ultimately purchase the online merchants' products or services were deprived of their rightfully-earned commissions.

115.   Because Plaintiff and Class members were deprived of their rightfully-earned commissions, they sustained harm as a direct and proximate result of Defendants' tortious interference with prospective economic advantage. Plaintiff and Class Members accordingly seek damages in an amount to be proven at trial, as well as injunctive relief barring further interference.

## COUNT III

### Intentional Interference with Contractual Relations

### (*On behalf of Plaintiff and the Class*)

116.   Plaintiff re-alleges and incorporates by reference all factual allegations above as if fully set forth herein.

117.   Plaintiff and Class Members have ongoing, valid, and enforceable contractual agreements with online merchants to promote products and services in exchange for commissions.

118.   PayPal knew that online merchants have these ongoing contractual relationships with Plaintiff and Class Members, under which Plaintiff and Class Members receive commissions from online merchants via affiliate links under a last-click-attribution model.

**CLASS ACTION COMPLAINT**

119.    PayPal intentionally disrupted this contractual relationship by intentionally replacing the affiliate cookies associated with Plaintiff's and Class Members' affiliate links with tracking cookies associated with PayPal Honey.

120.    Because Plaintiff and Class members were deprived of their rightfully-earned commissions, they sustained harm and economic injury as a direct and proximate result of PayPal's tortious interference with contractual relations. Plaintiff and Class Members accordingly seek damages in an amount to be proven at trial, as well as injunctive relief barring further interference.

## COUNT IV

### Conversion

### (*On behalf of Plaintiff and the Class*)

121.    Plaintiff re-alleges and incorporates by reference all factual allegations above as if fully set forth herein.

122.    Plaintiff and Class Members had a property interest in the commissions for the purchases of products or services of online merchants by individuals using the affiliated links associated with Plaintiff and Class Members.

123.    By programming the PayPal Honey web browser extension to replace the tracking cookies associated with Plaintiff's and Class Members' affiliated links with a tracking cookie associated with PayPal, resulting in online merchants crediting Defendants with the sale of their products or services rather than Plaintiff and Class Members, Defendants misappropriated the commissions that online merchants owed to Plaintiff and Class Members for the promotion of their products or services.

124.    As a direct and proximate cause of Defendants' conduct, Plaintiff and Class Members have been harmed by the loss of their commissions.

125.    Plaintiff and Class Members seek all damages and consequential damages proximately caused by Defendants' conduct.

## COUNT V

### Computer Fraud and Abuse Act

### 18 U.S.C. § 1030

*(On behalf of Plaintiff and the Class)*

126.    Plaintiff re-alleges and incorporates by reference all factual allegations above as if fully set forth herein.

127.    The Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030, makes it unlawful for anyone to "knowingly and with intent to defraud, access[] a protected computer without authorization, or exceed[] authorized access, and by means of such conduct further[] the intended fraud and obtain[] anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period." 18 U.S.C. § 1030(a)(4).

128.    Through its browser extension, PayPal knowingly and with intent to defraud exceeded its authorized access to the browsers and computers of users that downloaded its browser extension, and through this conduct furthered its fraudulent scheme to wrongfully obtain the affiliate commissions of Plaintiff and Class Members.

129.    PayPal exceeded its authorized access to the computers of its users by altering or removing affiliate cookies that PayPal was not entitled to alter or remove. Cookie-stuffing extensions, like PayPal Honey, are considered "malicious code" that alter cookies they are not authorized to alter.[43] PayPal exceeded its authorized access by exploiting vulnerabilities in the restrictions placed on browser extensions and by exploiting vulnerabilities in the restrictions put in place by affiliate networks to prevent cookie stuffing.

130.    As described above, when a user activates the PayPal Honey extension it surreptitiously opens a new browser tab in the background to avoid detection by the user. PayPal Honey then artificially mimics a genuine click on an affiliate marketing link associated with its own affiliate marketing account in this hidden browser tab, causing the merchant's website to replace the affiliate cookies of Plaintiff and the Class with PayPal Honey's affiliate cookie.

---

[43] McAfee Labs, *Malicious Cookie Stuffing Chrome Extensions with 1.4 Million Users* (Aug. 29, 2022), https://www.mcafee.com/blogs/other-blogs/mcafee-labs/malicious-cookie-stuffing-chrome-extensions-with-1-4-million-users/.

131.    This technically sophisticated technique is designed to exploit vulnerabilities in the restrictions placed on browser extensions, and in the technical restrictions put in place by affiliate networks, to allow PayPal Honey to artificially "trick" the user's browser and the merchant's website into replacing the legitimate affiliate cookies of Plaintiff and Class Members with the illegitimate affiliate cookies of PayPal Honey.

132.    Users of PayPal Honey do not expect the PayPal Honey extension to operate in this manner or to alter this data, and the extension's cookie-stuffing functionality is not disclosed in the applicable terms of service or privacy policy, or in any information that is disclosed to users who install the extension in the ordinary course.

133.    PayPal Honey's malicious code is executed in the browsers of computers that are used in or affect interstate commerce, and thus meet the definition of "protected computer" under the CFAA.

134.    PayPal's substitution of its own affiliate cookies for the affiliate cookies of Plaintiff and Class Members impairs the integrity and availability of the data contained in the original affiliate cookies designating Plaintiff and Class Members as the proper party to receive an affiliate commission. As a result of PayPal's unlawful scheme, Plaintiff and Class Members have lost substantial revenue from these highly valuable commissions that were improperly diverted to PayPal. Thus, Plaintiff and Class Members have suffered damage and loss well in excess of $5,000 during a year within the relevant period as a result of PayPal's conduct.

135.    Plaintiff and the Class seek compensatory damages, injunctive relief, and all other legal or equitable relief available under the CFAA.

## COUNT VI

### California Comprehensive Computer Data Access & Fraud Act

### Cal. Penal Code § 502

### (*On behalf of Plaintiff and the California Subclass*)

136.    Plaintiff re-alleges and incorporates by reference all factual allegations above as if fully set forth herein.

137.    Under the California Comprehensive Computer Data Access & Fraud Act (CDAFA), Cal. Penal Code § 502, a person or entity is liable under the statute if it:

(1) Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data.
. . .
(4) Knowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network.
. . .
(8) Knowingly introduces any computer contaminant into any computer, computer system, or computer network.

138.    Through its browser extension, PayPal knowingly accesses and without permission alters, damages, deletes, and/or destroys the affiliate cookie data of Plaintiff and Class Members, in order to both (a) execute its unlawful and fraudulent scheme and (b) wrongfully control or obtain money, property, or data through the diversion of affiliate commissions that rightfully belong to Plaintiff and Class Members.

139.    Through its browser extension, PayPal knowingly accesses and without permission adds, alters, damages, deletes, and/or destroys the affiliate cookie data of Plaintiff and Class Members, which resides on a covered computer system.

140.    Under CDAFA, a "computer contaminant" is "any set of computer instructions that are designed to modify, damage, destroy, record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information." Cal. Penal Code § 502(b)(12).

141.    Plaintiff and Class Members have an ownership interest in the affiliate cookie data that is modified, damaged, and/or destroyed by the PayPal Honey extension. The PayPal Honey extension contains computer instructions that are designed to modify, damage, and/or destroy the affiliate cookie data of Plaintiff and Class Members without their intent or permission, thus meeting the definition of "computer contaminant" under CDAFA. PayPal knowingly introduces this computer contaminant into the computers of users of its browser extension in violation of CDAFA.

142.    PayPal did not request or receive permission from either the users of its browser extension or Plaintiff and Class Members to add, alter, damage, delete, or destroy the affiliate cookie

1    data of Plaintiff and Class Members residing on users' browsers, nor did PayPal request or receive

2    permission to divert the affiliate commissions of Plaintiff and Class Members to PayPal.

3        143.    The PayPal Honey extension's cookie-stuffing functionality is not disclosed in the

4    applicable terms of service or privacy policy, or in any information that is disclosed to users who

5    install the extension in the ordinary course.

6        144.    As a result of PayPal's unlawful scheme, Plaintiff and Class Members have lost

7    substantial revenue from highly valuable commissions that were improperly diverted to PayPal.

8        145.    Plaintiff and Class Members seek compensatory damages, injunctive relief, and all

9    other legal or equitable relief available under the CDAFA.

10       146.    Because PayPal's conduct is willful and fraudulent, Plaintiff and Class Members

11   seek punitive or exemplary damages, as available under CDAFA. PayPal concealed the material

12   fact that it was diverting affiliate commissions from content creators to itself, depriving Plaintiff and

13   Class Members of substantial commissions.

14                              **COUNT VII**

15                      **California Unfair Competition Law**

16                   **Cal. Bus. & Prof. Code § 17200, *et seq*.**

17               ***(On behalf of Plaintiff and the California Subclass)***

18       147.    Plaintiff re-alleges and incorporates by reference all factual allegations above as if

19   fully set forth herein.

20       148.    California's Unfair Competition Law (UCL), prohibits "any unlawful, unfair or

21   fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200, *et seq*.

22       149.    PayPal's conduct violates the "unlawful" prong of the UCL because, as described

23   above, PayPal's scheme constitutes unjust enrichment, conversion, tortious interference with a

24   prospective and ongoing business relationship, and a violation of CDAFA.

25       150.    PayPal's conduct violates the "unfair" prong of the UCL because it unfairly diverts

26   Plaintiff's and Class Member's affiliate commissions to PayPal in violation of California public

27   policy, as described above. PayPal's scheme provides no legitimate benefit or utility to consumers

28   or the marketplace, while causing significant harm to Plaintiff and Class Members.

151.    As a result of PayPal's unlawful scheme, Plaintiff and Class Members have lost substantial revenue from highly valuable commissions that were improperly diverted to PayPal.

152.    Plaintiff and Class Members seek restitution, injunctive relief, and all other legal or equitable relief available under the UCL, as well attorneys' fees and costs as provided under California law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

a)    For an Order certifying this action as a Class Action and appointing Plaintiff as Class Representative and his counsel as Class Counsel;

b)    For equitable relief enjoining Defendants from engaging in wrongful conduct complained of herein and to reform the practice of Defendants' PayPal Honey web browser extension replacing cookies associated with affiliate links of Plaintiff and Class Members with PayPal's own affiliate cookies;

c)    For an award of actual damages, compensatory damages, statutory damages, nominal damages, and/or statutory penalties in an amount to be determined, as allowable by law;

d)    For an award of punitive damages, as allowable by law;

e)    For an award of attorneys' fees, as allowable by law;

f)    Pre- and post-judgment interest on any amounts awarded; and

g)    Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Under Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: January 16, 2025

*/s/ Christopher L. Lebsock*
Christopher L. Lebsock (CA No. 184546)
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
(415) 633-1908
clebsock@hausfeld.com

James J. Pizzirusso* (D.C. Bar No. 477604)
Amanda V. Boltax* (D.C. Bar No. 90013893)
Ian E. Engdahl* (D.C. Bar No. 1613748)
**HAUSFELD LLP**
888 16th Street N.W., Suite 300
Washington, DC 20006
(202) 540-7200
jpizzirusso@hausfeld.com
mboltax@hausfeld.com
iengdahl@hausfeld.com

Steven M. Nathan (CA No. 153250)
**HAUSFELD LLP**
33 Whitehall Street
Fourteenth Floor
New York, NY 10004
(646) 357-1100
snathan@hausfeld.com

Joseph J. DePalma* (N.J. No. 2151982)
Catherine B. Derenze* (N.J. No. 275852018)
Collin J. Schaffhauser* (N.J. No. 433052023)
**LITE DEPALMA GREENBERG
& AFANADOR, LLC**
570 Broad St., Suite 1201
Newark, NJ 07102
(973) 623-3000
jdepalma@litedepalma.com
cderenze@litedepalma.com
cschaffhauser@litedepalma.com

Mindee J. Reuben* (N.J. No. 75308)
**LITE DEPALMA GREENBERG
& AFANADOR, LLC**
1515 Market Street, Suite 1200
Philadelphia, PA 19102
(215) 854-4060
mreuben@litedepalma.com

***Attorneys for Plaintiff***

* *pro hac vice forthcoming*